**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

PHAT BUI,

      Plaintiff,

v.                                       Case No. 18-13520

MILTON MANUFACTURING, INC.,

      Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT IN PART AND DISMISSING THE REMAINING STATE LAW
COUNT WITHOUT PREJUDICE**

**I. INTRODUCTION**

Plaintiff Phat Bui sues Defendant Milton Manufacturing, Inc. alleging violations of both state and federal employment discrimination statutes. Plaintiff asserts that he was harassed and eventually terminated from his position as a senior mechanic in Defendant's Detroit plant because of his national origin and age. Defendant now moves for summary judgment on all eleven counts. The motion has been fully briefed, and the court concludes that a hearing is not necessary. *See* E.D. Mich. 7.1(f)(2). For the reasons stated below, the court will grant Defendant's motion for summary judgment as to ten of the counts, and it will decline to exercise supplemental jurisdiction over the remaining state law claim.

**II. BACKGROUND**

Plaintiff Phat Bui was born in 1971 in Vietnam and is of Asian descent. (ECF No. 1, PageID.3.) On November 14, 2016, Plaintiff was hired by Defendant Milton

Manufacturing, Inc., at their Detroit plant. (*Id.*) Defendant is a component supplier for both the automotive and defense industries and produces various vehicle parts at its Detroit facility. (ECF No. 17-2, PageID.141.)  Plaintiff was hired as a senior mechanic to operate and maintain CNC metal lathes in Defendant's machining department. (ECF No. 17-3, PageID.161, 181-82.)

Defendant's facility is a "union shop" represented by UAW Local 155. (*See* ECF No. 17-23.) Consequently, work terms and wage rates are governed by a union contract. (*Id.*) The agreement provides that bargaining unit employees, like Plaintiff, must abide by Defendant's separately promogulated attendance policy. (*Id.*, PageID.376.) The attendance policy provides that "[e]mployees will be allowed twelve (12) points for unplanned/unscheduled/unexcused absences, early quits and tardiness during the most recent 365-day period." (ECF No. 17-5, PageID.282.) Points are awarded according to the type of absence.

| | |
|---|---|
| Clocking in more than two minutes after scheduled start time or returning to work station late from break or lunch. | .25 point |
| Clocking in one (1) hour or more after the scheduled start time or punching out or leaving work station before the scheduled end of the employee's shift (including overtime). | .50 point |
| Full day absence* | 1 point |
| Full day absence without calling in to the attendance hotline **before** the scheduled start of the employee's shift. | 2 points |

*In the event an employee is absent from work (with proper notice to the company) for two (2) or more consecutive days and presents a doctor's note verifying that the employee was unable to report to work on the days at issue, the period of absence will be considered as one (1) occurrence and the employee will only be charged one (1) point.

(*Id.* at 283.) Under the policy, employees are subject to progressive disciplinary steps when they accumulate points starting with verbal warnings, then suspensions, and finally termination. (*Id.*) Employees who accumulate 12 points or more points "will be

2

terminated pending review." (*Id.*) The policy also provides for a reduction of up to one point for each 30-day period of "perfect attendance." (*Id.*)

The attendance policy is administered by Defendant's H.R. Manager Belinda Cunningham. (ECF No. 17-2, PageID.116, 128.) She tracks an employee's unexcused absences, decides how points should be assessed, and ultimately determines when an employee should be terminated under the policy. (*Id.*) According to Defendant, after accumulating 16.75 points in under a year of employment, Plaintiff was terminated by Cunningham for a violation of the attendance policy on October 16, 2017. (ECF No. 17-4, PageID.278.)

Plaintiff asserts that the decision to terminate him was actually based on discriminatory motives—age and national origin—not his poor attendance record. (ECF No. 1, PageID.3.) Plaintiff alleges that throughout his employment he was regularly ignored in social settings by his supervisor and coworkers. (*Id.,* PageID.3.) In his complaint, Plaintiff alleged that both his "coworkers and supervisors would laugh and yell at Plaintiff daily, as compared to persons whose national origin and race differed from Plaintiff." (*Id.*) However, in his deposition, Plaintiff "walked back" some of his allegations stating that only his coworkers, and not his supervisors, would regularly laugh and yell at him based on his accent. (*See* ECF No. 17-3, PageID.172; ECF No. 21-2, PageID.626.)) And Plaintiff stated that such alleged comments by coworkers occurred, at most, a "couple times a week"—not "daily" as originally asserted. (*Id.,* PageID.173.)

3

Plaintiff testified that his African American direct supervisor, Rick Hayes, also engaged in harassing conduct. (ECF No. 17-3, PageID.216; 235-36, 240.) He recounted the following alleged incidents:

- On February 17, 2017, he heard Hayes say, while talking to coworkers, that they should "get that motherfucker out of the facility," while looking and pointing toward Plaintiff. (ECF No. 21-2, PageID.552.)

- On April 21, 2017, Hayes told Plaintiff that he would "suffer [here] because you took a white man's job." (ECF No. 1, PageID.3 ¶ 15).[1]

- After Plaintiff refused to continue training one of his coworkers, Hayes yelled at Plaintiff during a May 25, 2017 team meeting, telling Plaintiff that "you are not welcome here," and "the door is open, you can walk out any time." (*Id.* at ¶ 16; ECF No. 17-3, PageID.235-36.)

- On September 9, 2017, Hayes did not invite Plaintiff to a meeting with the rest of Hayes's team. (ECF No. 21-2, PageID.685.)

- On September 29, 2017, Hayes and plant manager Randy Gawel came to Plaintiff's workstation and questioned his decision to work on production for a particular program, but they backed off after he explained his cost saving rationale. (*Id.*, PageID.687-68.)

While Plaintiff does not directly contest most of his recorded absences, he does contend that he was assessed attendance points by Cunningham in situations where other employees would not have been disciplined. (ECF No. 21, PageID.404.) Despite not contesting the attendance points when issued, Plaintiff now argues that a number of the points assessed were improper. (*Id.*, PageID.404-05.) He also notes two incidents

---

[1] While Plaintiff's complaint originally alleged that "[o]n May 25, 2017 Plaintiff's supervisor [Rick Hayes] told Plaintiff that Plaintiff would 'suffer [here] because you took a white man's job,'" (ECF No. 1, PageID.3 ¶ 15), Plaintiff modified this claim in his deposition. First, he testified that Paragraph 15 of the complaint was a "mistake" and that the conversation with his supervisor actually occurred on "April 21" of 2017. (ECF No. 17-3, PageID.165, 235). It should also be noted that Plaintiff also seemed to walk back the allegation during his deposition equivocating on whether Hayes actually said the words "white man." (*See Id.* at 220 ("He didn't mention white man who, Richard or Nicolas Kiefer.").)

where he successfully challenged attendance points while employed at Milton and had the points removed from his record. (*Id.,* PageID.405.) He argues that on the whole, the record shows he was assessed "bogus" attendance points to hide the true reasons for his termination. (*Id.*)

In his deposition, Plaintiff theorized, based on rumors he had heard, that other employees wanted to push him out to make room for another younger, white employee, Nicholas Keifer to "get his old position" back in his machine shop. (ECF No. 21-2, PageID.565.) Cunningham's affidavit however attests that "Mr. Kiefer was never employed in Plaintiff's position prior to Plaintiff's hiring." (ECF No. 17-4, PageID.278.)

Plaintiff testified he was aware of Defendant's harassment and discrimination policy. (*See* ECF No. 17-15, PageID.326; ECF No. 17-22, PageID.346-50.) During his time working for Defendant, Plaintiff filed multiple official complaints pursuant to the policy alleging that he was being mistreated under a number of varying theories, and Cunningham provided a response to each of the complaints. First on February 23, 2017, he sent an email to Cunningham complaining that a hostile work environment existed between management and employees and stated that "by accident I walked into this civil war, please let me a [sic] chance to walk out." (ECF No. 17-10, PageID.314.) On April 23, 2017, he sent another complaint alleging that coworkers were spreading false rumors about Plaintiff because he refused to join the union.[2] (ECF No. 17-10, PageID.314.) The rumors consisted of allegations that his coworkers in the machine

---

[2] Michigan is a "right to work" state where workers have the "freedom to choose whether or not to join a union" and cannot be forced to pay union dues or lose their job if they decline to join. *See*, *Freedom to Work*, Mich. Dep't. of Licensing and Regulatory Affairs (March 2013) https://www.michigan.gov/lara/0,4601,7-154--292490--,00.html.

shop were either taking vacation time or finding new jobs to avoid having to work with him. (*Id.*) On April 27th, he sent another email to Cunningham complaining about a verbal warning he received for attendance violations, and he linked the warning to his refusal to join the union, implying retaliation. (ECF No. 17-14, PageID.324.)

Finally, on May 22, 2017, Plaintiff filed an official complaint with the EEOC. (ECF No. 17-16, PageID.333.) It was this complaint that for the first time raised the issue of harassment based on national origin. (*Id.*) However, the complaint alleged harassment only by the "Plant Manager." (*Id.*) Plaintiff also sent a follow-up email to Cunningham the next day, asserting that plant manager Randy Gawel "has been emotionally abusing me for the past few months."  (ECF No. 17-17, PageID.335.) The email's explanation of the harassment is largely incomprehensible, but it does not allege any harassment by Plaintiff's coworkers and makes reference only to the "white man's job" comment without specifying the speaker. (*Id.*) On October 4, 2017, the EEOC notified Plaintiff that it had declined to pursue his complaint. (ECF No. 17-18, PageID.338.)

Plaintiff was terminated on October 16, 2017 for a violation of "Milton's Attendance Policy" by Cunningham. (ECF No. 17-4, PageID.277.) Cunningham testified that the firing was not at all related to his on the job performance, only his attendance. (ECF No. 21-1, PageID.429.) After Plaintiff's termination, Cunningham's affidavit states that Plaintiff's responsibilities were redistributed among other Milton employees. (ECF No. 17-4, PageID.277.) It was only in January 2020 that another employee, Nicholas Keifer, was elevated to Plaintiff's former position. (*Id.*)

Following Plaintiff's termination in October 2017, he filed a complaint with the EEOC. (ECF No. 17-20, PageID.342.) In his new EEOC complaint, Plaintiff alleged that

6

he was subjected to harassment based on his age, race, and national origin. (*Id.*) He also alleged that he was replaced at his position by a younger white male. (*Id.*) The EEOC notified Plaintiff on August 8, 2018 that it decided to close the complaint after an investigation by the Michigan Department of Civil Rights. (ECF No. 17-21, PageID.344.)

Plaintiff, who had decided to join the UAW shortly before he was terminated, also filed a complaint with the National Labor Relations Board (NLRB) alleging that the union had failed to adequately represent him in disciplinary proceedings. (ECF No. 17-20, PageID.379-82.) However, the claim was soon dismissed when the NLRB found that the evidence did not support Plaintiff's claims. (*Id.*)

Following the denial of these claims, Plaintiff commenced the present lawsuit on November 12, 2018. (*See* ECF No. 1, PageID.1.) Under both Federal and Michigan law, Plaintiff alleges that he was (1) harassed based on his national origin and age, (2) wrongfully discharged due to both his national origin and age, (3) retaliated against for his initial May 22, 2017 EEOC complaint. (*Id.,* PageID.5-17.)

### III. STANDARD

Summary judgment is appropriate when there exists no dispute of material fact and the moving party demonstrates entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the court considers all evidence, and all reasonable inferences flowing therefrom, in the light most favorable to the nonmoving party. *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). The court may not make credibility determinations or weigh the evidence presented in support or opposition to a motion for summary judgment, only the finder of fact can

make such determinations. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

The movant has the initial burden of showing—pointing out—the absence of a genuine dispute as to any material fact; i.e., "an absence of evidence to support the nonmoving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). The burden then shifts to the nonmoving party to set forth enough admissible evidence to raise a genuine issue of material fact for trial. *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248; *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017). Not all factual disputes are material. A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim "and would affect the application of the governing law to the rights of the parties." *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013).

## IV. DISCUSSION

Plaintiff has raised a total of eleven claims under both federal and Michigan law. The court addresses each of these claims in turn, when possible grouping claims that rely on a common nucleus of facts and require a similar legal analysis.

### A. Title VII National Origin Hostile Work Environment Claim

The first count of Plaintiff's complaint alleges that he was subjected to harassment and a hostile work environment based on his national origin. He argues that the conduct of Defendant's employees amounts to discrimination under Title VII, 42

U.S.C. § 2000e *et seq*. (ECF No. 1, PageID.5-6.) The standard used in assessing such

a claim is well developed.

> To allege a hostile work environment claim based on race or national origin
> under Title VII or the [Michigan's Elliott-Larsen Civil Rights Act (ELCRA)], a
> plaintiff must demonstrate that "(1) [he] belongs to a protected class; (2) [he] was
> subject to unwelcome harassment; (3) the harassment was based on race [or
> national origin]; (4) the harassment affected a term, condition, or privilege of
> employment; and (5) the defendant knew or should have known about the
> harassment and failed to take action." *Phillips v. UAW Int'l*, 854 F.3d 323, 327
> (6th Cir. 2017); see *Boutros v. Canton Reg'l Transit Auth.*, 997 F.2d 198, 203 (6th
> Cir. 1993) (applying analysis to national-origin based claim); *see also Phillips*,
> 854 F.3d at 327 n.3 ("The elements are substantially the same for [the] ELCRA
> claim."); *Quinto v. Cross & Peters Co.*, 451 Mich. 358, 547 N.W.2d 314 (1996).
> When evaluating these claims, this court "look[s] at the totality of the alleged [ ]
> harassment to determine whether it was 'sufficiently severe or pervasive to alter
> the conditions of [a plaintiff's] employment and create an abusive working
> environment.' " *Phillips*, 854 F.3d at 327 (quoting *Williams v. CSX Transp. Co.*,
> 643 F.3d 502, 512 (6th Cir. 2011) (alteration in original) (quoting *Harris v. Forklift
> Sys.*, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993))). The
> circumstances we consider include "the frequency of the discriminatory conduct;
> its severity; whether it is physically threatening or humiliating, or a mere offensive
> utterance; and whether it unreasonably interferes with an employee's work
> performance." *Phillips*, 854 F.3d at 327 (quoting *Nat'l R.R. Passenger Corp. v.
> Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (internal
> citation omitted)).
>
> "[T]his court has established a relatively high bar for what amounts to actionable
> discriminatory conduct under a hostile work environment theory." *Phillips*, 854
> F.3d at 328. "[O]ccasional offensive utterances do not rise to the level required to
> create a hostile work environment because, '[t]o hold otherwise would risk
> changing Title VII into a code of workplace civility.' " Id. at 327 (quoting *Grace v.
> USCAR*, 521 F.3d 655, 679 (6th Cir. 2008)). For example, in the context of
> alleged racial discrimination, this court has determined that "even offensive and
> bigoted conduct is insufficient to constitute a hostile work environment if it is
> neither pervasive nor severe enough to satisfy the claim's requirements." Id. at
> 328; *see also Clay v. United Parcel Service*, 501 F.3d 695, 707–08 (6th Cir.
> 2007).

*Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482-83 (6th Cir. 2020). The Supreme Court has

further clarified that Title VII does "not prohibit all verbal or physical harassment in the

work place; it is directed only at 'discriminat[ion]. . . because of'" the protected

characteristics. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

"Mere disrespect or antipathy will not be actionable under the statute unless a plaintiff can prove that such was motivated by discriminatory animus." *Khalaf,* 973 at 484 (citing *Id.*). The "conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's [protected characteristics]." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012).

The Supreme Court has essentially adopted a two-step test for the (fifth) respondeat superior element. *See Collette v. Stein-Mart*, Inc., 126 F. App'x 678, 682 (6th Cir. 2005). "Under Title VII, an employer's liability for such harassment may depend on the status of the harasser." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). If the harassing employee is a coworker, then "the employer is liable only if it was negligent in controlling working conditions." *Id*. But when the alleged harasser is Plaintiff's supervisor, the court must determine "[i]f the supervisor's harassment culminates in a tangible employment action." *Id.* If the answer is "yes," then "the employer is strictly liable." *Id.* "But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.* (citations omitted). "This is known as the *Ellerth/Faragher* defense." *Collette*, 126 F. App'x at 682.

Defendant argues that Plaintiff has not presented a prima facie case under Title VII. First, Defendant argues that Plaintiff's failure to follow Title VII's strict ninety-day filing deadline has time barred liability for the majority of the allegations Plaintiff uses to support his harassment claim under federal law and the remaining claims are not

10

sufficient to meet the "relatively high bar" required to show harassment. (ECF No. 17, PageID.92.) It further argues these remaining claims cannot be pursued under Title VII because (1) "Milton investigated each claim actually raised by Bui and found no harassment or discrimination" and (2) Plaintiff "has not identified an objectively pervasive environment of harassment on the basis of his race or national origin." (*Id.,* PageID.96-99.) The court agrees that Defendant should be awarded summary judgment under Title VII.

Plaintiff first filed a hostile work environment claim with the EEOC on May 22, 2017, alleging that the "plant manager" had harassed Plaintiff due to his race and national origin. (ECF No. 17-16, PageID.333; ECF No. 21, PageID.408.) Plaintiff now admits that he is precluded from relying on alleged facts which occurred prior to the May 22, 2017 filing of the EEOC action because he failed to bring suit in federal court within 90 days of receiving a right to sue letter from the EEOC. (ECF No. 21, PageID.408.) Citing *Jackson v. Quanex Corp.*, *191 F.3d 647 (6th Cir. 1999)*, Plaintiff contends that evidence regarding these past events is "still *admissible* as background evidence to support and explain the significance of later facts and claims."[3] (*Id.*)

Fair enough. But even if the court considers such evidence from before May 22, 2017 as relevant background information, it becomes clear that the remaining alleged incidents of harassment that occurred after May 22, 2017 are insufficient to support the

---

[3] The court notes that by arguing that evidence of passed harassment can only be admitted as "relevant background information," (ECF No. 21, PageID.408), Plaintiff has forfeited any potential argument that such past harassment can serve as any kind of legal basis for his current harassment claims under Title VIII. *See, e.g., Wade v. Knoxville Utilities Bd.,* 259 F.3d 452, 460–61 (6th Cir. 2001) ("The continuing violation doctrine, however, does not relieve a plaintiff of the need to file an action within 90 days of receiving the right-to-sue letter.").

basis for a prima facie claim for a hostile work environment against the Defendant as an employer.

Title VII hostile work environment claims are reviewed under a "totality of the circumstances" test "'the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case.'" *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir.1999)). Because "[d]ifferent rules apply if the harasser is the victim's supervisor," as opposed to a coworker, the court will engage in a separate analysis of the allegations against Hayes and Cunningham. *See Equal Employment Opportunity Comm'n v. AutoZone, Inc.*, 692 F. App'x 280, 283 (6th Cir. 2017) (quoting *Vance v. Ball State Univ.*, 570 U.S. at 424.) ("'[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim'" [such tangible actions include] "'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'")

Plaintiff's complaint alleges four types of harassing actions that allegedly occurred or continued after May 22, 2017:

> 12. Almost immediately, Plaintiff's co-workers and supervisors began to ignore Plaintiff daily, as compared to persons whose national origin and race differed from Plaintiff, and who were not ignored.
> . . .
> 13. Plaintiff's co-workers and supervisors would laugh and yell at Plaintiff daily, as compared to persons whose national origin and race differed from Plaintiff, and who were not laughed at and ignored.
> . . .
> 16. This same supervisor told Plaintiff, "you are not welcome here," and "the door is open, you can walk out any time."

. . .

20. In the months that ensued, Defendant increased the hostile environment
Plaintiff was suffering, including but not limited to, by issuing Plaintiff
attendance points despite Plaintiff having complied with Defendant's
policy for attendance.

(ECF No. 1, PageID.3-4.)[4] During his deposition, however, Plaintiff equivocated on a

number of these claims so the record as a whole illustrates little evidence of harassment

based on national origin and virtually no evidence of actionable conduct by

"supervisors" Hayes and Cunningham.

Plaintiff testified in his deposition that Paragraph 12 and Paragraph 13 of his

complaint were based on perceived problems with his coworkers not issues with his

direct supervisor. First, Plaintiff testified that he felt "ignored" by coworkers because

they talked too fast in English for him to understand, so he often could not participate in

conversations. (ECF No. 17-3, PageID.163.) Second, Plaintiff testified that his two

coworkers Richard Fogg and Alex Fakhouri, who would sometimes have trouble

understanding Plaintiff, would laugh and poke fun at his accent. (*See id.,* PageID.172

("When I speak to them. . . they laugh and [say] what the hell you talking about. . . [s]o I

try to speak slowly or spell out the word in English for them to [sic] understood what I

say.").) Plaintiff stated that such alleged comments by coworkers occurred, at most, a

"couple times a week"—not "daily" as originally alleged. (*Id.,* PageID.173.) Plaintiff

further testified that despite his initial pleadings, he "[could] not recall" any instance of

---

[4] Plaintiff's complaint also originally alleged that "[o]n May 25, 2017 Plaintiff's
supervisor [Rick Hayes] told Plaintiff that [he] would 'suffer [here] because you took a
white man's job,'" however, since Plaintiff later clarified that this the "white man's job"
comment occurred on April 21, 2017, (*see* ECF No. 17-3, PageID.165, 235), this claim
is not an actionable incident of harassment under Title VIII. It occurred before the May
22, 2017 EEOC complaint and is at most "background evidence."

his direct supervisor Rick Hayes, or "any other supervisor" complaining about his accent. (ECF No. 21-2, PageID.626.)

Plaintiff alleges in Paragraph 16, that on May 25, 2017, he was yelled at by his direct supervisor Rick Hayes who told him that "nobody [was] mak[ing] you stay here, the [sic] door open, get out" during a morning meeting. (ECF No. 1, PageID.3; ECF No. 21-2, PageID.624.) However, when prompted during his deposition Plaintiff provided further context that leads inexorably to the conclusion that Hayes's harsh words were most likely motivated by Plaintiff's public insubordination, not his race or national origin. Plaintiff testified that he had been training Alex Fakhouri on a machine during the previous week, and that during the morning meeting, Hayes asked him to continue training Fakhouri. (ECF No. 21-2, PageID.624.) Instead of accepting the continued training assignment, Plaintiff responded by telling Hayes that he did not want to be forced to talk to Fakhouri because he believed that the "safety person" would interpret his training as "illegal. . . chit-chat." (*Id.*, PageID.625.) In response to Plaintiff's public refusal to accept his assignment, Hayes told Plaintiff that he needed to interact with others and could not just "stay on [his machine] all day long." Hayes then "yelled" at Plaintiff, telling Plaintiff that he should "get out" if he didn't like working at Milton. (*Id.*)

At his deposition, Plaintiff also testified that Hayes engaged in harassment by holding a team meeting on Saturday, September 9, 2017 and excluding him. (ECF No. 21-2, PageID.685.) And, he contested that Hayes and the plant manger tried to make trouble when they came to his workstation one day to question his decision to work a production for a specific program. (*Id.,* PageID.687-68.)

Finally, Plaintiff alleges that he was singled out by his supervisors through the enforcement of Milton's point-based attendance policy. However, the evidence presented is clearly insufficient to establish a pervasive pattern of conduct meant to harass Plaintiff. First, it is undisputed that Belinda Cunningham, Defendant's H.R. Manager, not Hayes, oversaw tracking points under the attendance policy, monitoring employee timecards, and enforcing the policy. (ECF No.17-2, PageID.128.) Hayes's role was limited to approving or denying requests for days off made in advance. (*See* ECF No. 21-1, PageID.446.) Plaintiff highlights three instances where he disagreed with the calculation of attendance points for incidents that occurred after May 22, 2017. (ECF No. 21, PageID.404.)

- Plaintiff argues that he should not have been issued a half-point for leaving work early on May 25th because he left early to see a doctor "on an acute basis," (*Id.*), but Milton's attendance policy explicitly assesses points to the first day of any medical absence. (ECF No. 17-2, PageID.148; ECF No. 17-5, PageID.283.)

- Plaintiff contends that he went over 60 days without an unscheduled absence between May 25th and August 3rd, yet he only had a half-point deducted from his record, not a whole point for every thirty days as he contends the policy requires. (ECF No. 21, PageID.404) Cunningham testified that she has consistently interpreted the policy as requiring her to deduct only the last point earned (up to one point) after 30 days of perfect attendance, so the first 30 days without an absence resulted in the removal of only Plaintiff's May 25th half-point violation. (ECF No. 17-2, PageID.144-45.) Cunningham, however, could not say with certainty during the deposition why a second point was not removed, speculating that Plaintiff may have had an additional absence that had already been removed that did not appear on the report later sent to Plaintiff. (ECF No. 21-1, PageID.482.) Perhaps the failure to remove a second point was a mistake, but there is no evidence that Plaintiff ever raised the issue while still employed at Milton. Nor is there any evidence that his direct supervisors were at all connected with this alleged mistake,

- Plaintiff asserts he was also improperly assessed a point when he took the day off to service his car on August 29th, 2017 because Mr. Hayes

15

did not let him leave early the afternoon before to service his car.[5] Because car repairs are not listed under the enumerated exclusions in the attendance policy, however, the court concludes that it was proper for Cunningham to assess a point. (*See* ECF No. 17-5, PageID.282.)

In addition to these three disputed attendance points, Plaintiff also highlights two other incidents where he was initially assessed additional points that were later removed when he questioned them. (ECF No. 21, PageID.405.) While Plaintiff's brief contends these rescinded points are further evidence of "Defendant trying to terminate Plaintiff's employment with bogus attendance violations," (see *id.*), his own deposition testimony leads to a different conclusion. Plaintiff admitted that when he needed to take time off to have his car repaired on August 29th that he did not call the attendance hotline as required by Milton's policy. (ECF No. 21-1, PageID.444; ECF No. 21-2, PageID.638) Instead, he left a voice message on Hayes's direct line. (*Id.,* PageID.638.) Cunningham originally assessed the absence two-points as a "no call, no show" absence but, when Plaintiff complained, she investigated the incident and promptly removed the extra point, despite Plaintiff's failure to fully follow company procedure. (*Id.*) When shown proof, he called Milton. (*Id.*) Cunningham also initially assessed

---

[5] In the alternative, Plaintiff argues that other Milton workers were allowed to come in late or leave early without being assessed a point under the attendance policy, so he should not have been assessed a point for having his car repaired. (ECF No. 21, PageID.406.) Plaintiff, however, has not presented any evidence that would be admissible at trial that supports his claim of differential treatment. *See Tranter v. Orick*, 460 F. App'x 513, 514-15 (6th Cir. 2012) (citing *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir.2009)) (noting that "when deciding a summary judgment motion" it is "well established that a court may not consider hearsay" not otherwise "admissible at trial"). The evidence that supports this theory appears to be second-hand rumors or otherwise inadmissible statements of third parties, so the court will not consider it. (*See, e.g.,* ECF No. 21-2, PageID.627 (Plaintiff testifying that he heard his coworker Alex Fakhouri complaining how workers in another part of the facility "leave early" or "[don't] show up to work" without repercussions.).)

16

Plaintiff two points for a "no call, no show" on August 2nd. (*Id.,* PageID.637.) But when Plaintiff told Cunningham that he missed work because he had an EEOC mediation, she corrected the mistake and Plaintiff was given no points for the absence. (*Id.*) Far from being evidence of further harassment, a reasonable factfinder could only view these two incidents as evidence that Cunningham was fair and even accommodating in her enforcement of the attendance policy.

i.     **There is no evidence of harassment by Plaintiff's supervisors after May 22, 2017**

The parties did not take a position on whether both Hayes and Cunningham had enough tangible authority over Plaintiff to be considered a "supervisor" under *Vance*. *See id.* But even if the court assumes *arguendo* that both Cunningham and Hayes should be considered supervisors, Plaintiff has not presented sufficient evidence of harassment by either individual to survive a claim for summary judgment. To determine if harassment is "pervasive" enough to satisfy Title VII's "high bar," the court must examine multiple factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Khalaf*, 973 F.3d at 486. Despite initial pleadings to the contrary, Plaintiff made clear in his deposition that no supervisor criticized Plaintiff's accent. (ECF No. 21-2, PageID.626.)

During the relevant five-month time period, Plaintiff identified only three incidents of alleged harassment by Hayes. Even if the court were to assume—relying on background evidence—that Plaintiff's national origin was a factor in Hayes's single May

17

25th "offensive" comment, and in the two other incidents of workplace strife highlighted by Plaintiff, these three incidents are hardly evidence of "pervasive" harassment by Hayes because they occurred over a five-month period and none of the comments were explicitly related to Plaintiff's protected characteristics. *See, e.g., Clay*, 501 F.3d at 707–08 (holding that 15 incidents over a two-year time frame did not constitute severe or pervasive conduct).

Additionally, the court notes that while Plaintiff testified the May 25th incident made him upset enough that he took the rest of the day off, he also testified that, as a whole, his alleged hostile work environment did not meaningfully affect his work performance. (*See* ECF No. 17-3, PageID.252; ECF No. 21-1, PageID.429.) So, this is another factor that leans against finding pervasive harassment. *See* Phillips, 854 F.3d at 327.

Similarly, Plaintiff never alleges any "harassment" by Cunningham that can be directly, or by reasonable inference, traced to his national origin or race. Nowhere in his complaint or testimony does Plaintiff allege that Cunningham showed any outward signs of bias against Plaintiff based on these characteristics. Plaintiff's allegations against Cunningham are based entirely on the fact he disagreed with how his attendance points were calculated and his own subjective belief that Cunningham's conduct was motivated by his national origin. (*See* ECF No. 17-3, PageID.67, 239.) As the court's preceding analysis shows, most of the attendance points that Plaintiff now disputes were appropriate under the union bargained attendance policy. The record further demonstrates that when Plaintiff presented valid challenges to the attendance points, Cunningham gave Plaintiff the benefit of the doubt and promptly corrected potential

errors. (*See* ECF No. 21-2, PageID.637-38.) Even though the court is not able to resolve the validity of every attendance point assessed, examining the totality of the circumstances, there is no evidence sufficient for a trier of fact to conclude that Cunningham did not act in good faith when assessing points and addressing Plaintiff's challenges.

Any lingering factual disputes simply do not come close to creating a dispute of material fact that would show a pervasive pattern of harassment by Cunningham through her implementation of the policy. It is also undisputed that Plaintiff had significant attendance issues, amassing at least 17 unexcused absences in under a year of employment with Defendant, and Plaintiff concedes that the vast majority of the points were legitimate. (*See generally,* ECF No. 17-7.) In sum, Plaintiff has failed to present evidence that could establish a pervasive pattern of harassment by either Hayes or Cunningham between May 22nd, 2017 and Plaintiff's termination in October 2017. Consequently, their conduct cannot be used to support a Title VII harassment claim.

**ii.    There is no evidence that Defendant tolerated or condoned coworker harassment after May 22, 2017**

Whether the conduct of Plaintiff's coworkers after May 22, 2017—regularly laughing about Plaintiff's accent and excluding him socially—was sufficiently serious and pervasive to establish a harassment claim is a closer call. *See Khalaf,* 973 F.3d at 484 (explaining that "a fine line" exists regarding "discrimination based on accent. . . [so] each factual scenario must be evaluated contextually, considering that [u]nlawful discrimination does not occur ... when a Plaintiff's accent affects his ability to perform

the job effectively.") (quotation omitted). But the court need not answer that question at this juncture because it is abundantly clear that the Defendant did not know "about the [alleged] harassment and fail[] to take action." *See Phillips*, 854 F.3d at 327. Therefore, the court finds that Plaintiff has failed to establish the fifth element required for employer liability under Title VII when coworkers are the alleged source of harassment.

The standard applied to coworker harassment under Title VII is whether Defendants were negligent in "discovering or remedying harassment by [his] coworkers." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010) *see also Waldo*, 726 F.3d at 829, n.2. Applying this negligence standard, the Sixth Circuit has held that a plaintiff must show that the employer's response effectively "tolerated or condoned the situation or that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action." *Jackson v. Quanex Corp.*, 191 F.3d 647, 659 (6th Cir. 1999).

Defendant published "Harassment and Discrimination" policy, and Plaintiff was aware of the policy and even requested another electronic copy in April 2017. (ECF No. 17-22, PageID.346-350; ECF No. 17-15 (emailing copy).) Plaintiff evidently was also well informed about the policy's grievance procedure as he previously filed complaints with Cunningham during his time at Milton. (ECF No. 17-22, PageID.348.) Before May 22, 2017, Plaintiff had officially filed two complaints with Cunningham. First, he complained about the general tenor of the relationship between the employees and management, (*see* ECF No. 17-10, PageID.314.), and second that someone was spreading false rumors about him because he refused to join the union, (*see* ECF No. 17-2, PageID.318). Both complaints received an official response from Cunningham

20

indicating the results of her investigation. (ECF Nos.  17-11, 17-13.) Neither of these complaints alleged harassment based on national origin.

In fact, the specter of harassment based on national origin was not raised until Plaintiff's initial EEOC filing on May 22, 2017, and in a follow-up email to Cunningham dated May 23, 2017. (*See* ECF Nos. 17-16, 17-17.) However, in these documents Plaintiff identified the "Plant Manager" Randy Gawel as the source of the harassment not his coworkers. (*See Id.*) Following this letter Plaintiff did not file any further harassment complaints until his post-termination EEOC complaint. (*See* ECF No. 17-19.) Nor does Plaintiff allege any incidents of harassment involving Gawel after May 22, 2017, when his first EEOC complaint was filed.

Summarizing these facts, it is apparent that Defendant implemented and followed a standardized harassment policy. And until his termination, Plaintiff never alleged harassment by his coworkers involving his accent. Defendant cannot now be held negligent for harassment it had no reasonable way of knowing, especially when it is clear that Plaintiff knew how to file a human resources complaint. *See Montgomery*, 626 F.3d at 390. Because the evidence presented by Plaintiff does not show negligence on the part of the employer as a matter of law, Plaintiff's claims of coworker harassment after May 22, 2017 cannot serve as the basis for a valid Title VII harassment complaint. Therefore, summary judgment must be granted to Defendant on Count I of Plaintiff's complaint.

## B. Age Discrimination Claims

## 1. Harassment Based on Age

Plaintiff also asserts that he suffered harassment due to his age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 et seq., and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws 37.2101 et seq. For both, a plaintiff must show that (1) he was 40 or older; (2) he was subjected to harassment based on age; (3) the harassment had the effect of unreasonably interfering with his work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer. *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-35 (6th Cir. 1996) (ADEA); *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 468 (6th Cir. 2009) (ELCRA).

To demonstrate a hostile work environment, conduct must be so severe or pervasive that it rendered the plaintiff's work environment such that a reasonable person would find it abusive or hostile. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). *See also Crawford*, 96 F.3d at 835 (acknowledging that "courts routinely employ Title VII and ADEA case law interchangeably"). The Sixth Circuit "divides this inquiry into two steps: first, determine the relevant facts constituting age-based harassment; second, assess whether that conduct is sufficiently severe or pervasive to create a jury question." *Amini v. Rite Aid Corp.,* 819 F. App'x 344, 347 (6th Cir. 2020) (citing *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011).

While Plaintiff is over 40, none of the other three elements are properly supported. Even a cursory review of the pleadings and the record in this case make clear that evidence (and even detailed allegations) of age-based harassment are scant.

22

While Plaintiff's complaint provides at least some specific facts alleging national origin-based harassment, as to age Plaintiff alleges only generally that "Plaintiff's age was at least one factor that made a difference in Defendant's decision to harass Plaintiff." (*See* ECF No. 1, PageID.3, 10.)

Similarly, in the extensive excerpts of Plaintiff's deposition provided by the parties, Plaintiff recounted no specific incidents where his age was mentioned by his coworkers or supervisors. (*See generally*, ECF No. ECF No. 17-3; ECF No. 21-2.) And, when Plaintiff filed an EEOC complaint while still employed by Defendant he alleged only discrimination based on "race" and "national origin." (S*ee* ECF No. 17-16, PageID.333.) It was not until Plaintiff's termination that he first raised the issue of age discrimination in a new EEOC complaint. (*See* ECF No. 17-20, PageID.342.) In sum, despite the completion of discovery in the case, there is nothing more than mere conjecture supporting the idea that Plaintiff's age was also a factor in the alleged harassment.

This court finds that based on the totality of the circumstances, Plaintiff has both failed to provide evidence sufficient for a jury to find that he "was subjected to harassment based on age" or show that such harassment was so "severe or pervasive" that it altered the condition of Plaintiff's employment or created a hostile and abusive environment. The lack of a genuine dispute of material fact regarding these counts is also evinced by the contents of Plaintiff's responsive briefing, which makes no effort to rebut, or even acknowledge, Defendant's summary judgment motion as to all age-based counts. (*See* ECF No. 17, PageID.92-95; *see also* ECF No. 21.) Therefore, summary judgment is granted as to both Count V (ADEA) and Count VII (ELCRA).

## 2. Wrongful Discharge Based on Age

Plaintiff presents equally threadbare allegations claiming that Plaintiff's age was a factor in Defendant's decision to terminate his employment. Both the ADEA and the ELCRA prohibit firing employees because of their age. 29 U.S.C. § 623(a)(1); Mich. Comp. Laws § 37.2202(1)(a).

> Given this similar language, we have traditionally analyzed ADEA and ELCRA claims using the same causation standard. *See Richardson v. Wal–Mart Stores, Inc.*, 836 F.3d 698, 702 (6th Cir. 2016) (collecting cases). More recently, however, the Supreme Court has clarified that an ADEA plaintiff must demonstrate that his "age was the 'but-for' cause of the challenged adverse employment action." *Id.* at 703 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)). Michigan courts, on the other hand, have held that an ELCRA plaintiff can prove discrimination if his age was merely a "motivating," or "determining factor in the employer's decision." *Town v. Michigan Bell Tel. Co.*, 455 Mich. 688, 568 N.W.2d 64, 68–69 (1997); *see also Meagher v. Wayne State Univ.*, 222 Mich.App. 700, 565 N.W.2d 401, 410 (1997).

> Notwithstanding their different causation standards, a plaintiff may prove age discrimination under both state and federal law using the approach enunciated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.* at 704 (citing *McDonnell Douglas*, 411 U.S. at 792, 93 S.Ct. 1817); *see also Town*, 568 N.W.2d at 68-69.

*Lewis v. City of Detroit,* 702 F. App'x 274, 278-79 (6th Cir. 2017). The *McDonnell* framework allows a plaintiff to establish a claim of discrimination either by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination. *Id.* at 279.

"Direct evidence is evidence that, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Thompson v. City of Lansing*, 410 Fed. Appx. 922, 929 (6th Cir. 2011) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)). In other words, "[d]irect evidence must prove not only discriminatory animus, but also that the employer

acted on that animus." *Johnson v. Metro. Gov't of Nashville*, 502 Fed.Appx. 523, 534 (6th Cir. 2012).

Plaintiff presents no evidence that his age was even directly acknowledged by any of Defendant's employees and does not come close to showing direct evidence of discrimination. Proving a claim through direct evidence is generally a difficult standard to meet. *See Lewis*, 702 F. App'x at 290 (holding that comments including, referring to plaintiff as a ""old cantankerous guy" and as "retired in place" do not "rise to the level of direct evidence necessary to prove a claim of [age] discrimination"). Because Plaintiff has presented no evidence showing that Defendant's employees even mentioned Plaintiff's age during his employment, or as part of his termination, the factfinder would need to draw numerous inferences "in order to conclude that the challenged employment action was motivated at least in part by" Plaintiff's age. *See Johnson,* 319 F.3d at 865. Therefore, Plaintiff here has fallen well short of providing direct evidence of age discrimination.

Establishing a circumstantial case for wrongful discharge based on age first requires that Plaintiff present evidence supporting all the elements of prima facie case of age discrimination. *See McDonnell Douglas*, 411 U.S. at 803-05. In the present case, Plaintiff fails event this initial step. "To establish a prima facie case of age discrimination under the ADEA, a plaintiff must show that (1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a younger worker." *George v. Youngstown State Univ.*, 966 F.3d 446, 464 (6th Cir. 2020) (internal quotations omitted); *see also Lewis*, 702 F. App'x at 280. This light burden is "'easily

25

met' and 'not onerous.'" *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020).[6]

Defendant attacks the fourth prong of this analysis. It argues that despite Plaintiff's initial "alleg[ation] that Milton replaced him with a 'younger Caucasian American employee,'" the record now shows that Defendant "never hired a replacement for [Plaintiff's] position and only in January 2020 did an employee become eligible to be promoted" to the position. (ECF No. 17, PageID.94.) The court agrees.

Plaintiff argues that the fourth prong can be satisfied because a question of fact exists as to when Plaintiff was replaced by "Nicolas Kiefer" a younger white male employee. (ECF No. 21, PageID.414.) Plaintiff's response brief notes that he testified during his deposition that he "saw Kiefer mann[ing]. . . Plaintiffs machine on the day [he] was terminated." (*Id.*) He also testified that he believed that Kiefer had run that machine before he was hired. (*Id.*) However, Plaintiff also expressly admitted in his deposition that he had no personal knowledge of how his mechanic position in the machining department was filled after his termination. (*See* ECF No. 17-3, PageID.177-78 (Plaintiff stating that ""ha[d] no idea" who, if anyone, filled his position following his termination).) Plaintiff's observation—that he, on one occasion following his termination, saw Kiefer

---

[6] Michigan has adopted a parallel standard under ELCRA that also requires a plaintiff show that she has been replaced with a younger worker. "To establish a prima facie case of age discrimination under the intentional discrimination theory, the plaintiff must show that (1) she was a member of a protected class, (2) she was discharged, (3) she was qualified for the position, and (4) she was replaced by a younger person." *Winter v. Fitness USA Health Spas Corp.-Flint/Lansing*, No. 188648, 1999 WL 33430030, at *1 (Mich. Ct. App. Nov. 12, 1999) (citing *Matras v. Amoco Oil Co*, 424 Mich. 675, 682-683; 385 NW2d 586 (1986); *Barnell v. Taubman Co, Inc*, 203 Mich.App 110, 120; 512 NW2d 13 (1993)).

operating a machine previously assigned to Plaintiff—is evidence only that some of his responsibilities were redistributed to Kiefer. Such an observation is consistent with the testimony of Belinda Cunningham.

Cunningham provided an affidavit stating that Defendant "did not fill [Plaintiff's] position and re-assigned, as much as was possible, his tasks to other employees." (ECF No. 17-4, PageID.278.) Cunningham further explained that Nicholas Keifer only gained "sufficient experience [in January 2020] to be elevated from his then position into the position of Mechanic for the machining department that had been empty since [Plaintiff's] termination [over] two and half years prior." (*Id.*) Plaintiff presents no evidence directly contesting this assertion. In fact, Plaintiff's own deposition testimony lends further support to the assertion that other Milton employees lacked the experience to completely fill his position, requiring Defendant to rely on outside contractors to maintain equipment. (*See* ECF No. 17-3, PageID.182 (Plaintiff explained that only he could "maintain [a key] machine. . . [because] the maintenance guy [sic] not able to indicate the center line" [so before I was hired]. . . they must hire a subcontractor [sic] outside to do that but I [am] able to. . . fix the machine correctly.").)

The Sixth Circuit has previously held that "[s]preading the former duties of a terminated employee among the remaining employees does not constitute replacement." *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992). "A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (quotations omitted). Based on this standard, spreading Plaintiff's duties among other employees

"as much as possible" (as well as potentially relying on outside contractors for some tasks) does not constitute a replacement of Plaintiff.

Further, the eventual promotion of a younger employee to Plaintiff's position well over two years after his termination is insufficient to infer age discrimination. *See Lilley,* 958 F.2d at 752 (finding that the hiring of a new salesman "nine months later" after "business had picked up. . . does not mean that [the new hire] replaced [plaintiff] in any sense relevant to inferring age-based discrimination"); *Simpson v. Midland-Ross Corp.,* 823 F.2d 937, 941 (6th Cir. 1987) (finding that a three-month interval between plaintiff's termination and the hiring of a replacement "substantially weaken[s]" the inference).

No genuine dispute of material facts exists as to whether Plaintiff was replaced by a younger employee so Plaintiff cannot support his wrongful termination based on circumstantial evidence. Therefore, Defendant is entitled to summary judgment on both Count VI under the ADEA and Count VIII under the ELRCA for wrongful termination based on age.

### C. Wrongful Discharge Based on Race

Plaintiff's claims for wrongful discharge based on race fail for similar reasons. Title VII of the Civil Rights Act of 1964 makes it unlawful to "fail or refuse to hire or to discharge any individual. . . because of such individual's race, color, . . . or national origin[.]" 42 U.S.C. § 2000e–2(a)(1). Similarly, Michigan's ELCRA prohibits "discriminat [ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of ... race." Mich. Comp. Laws § 37.2202(1)(a) "The prima facie requirements for a discrimination case are the same

under Michigan law and federal law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

Intentional discrimination claims under Title VII can be proven by direct or circumstantial evidence. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648-49 (6th Cir. 2012) (citing *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.2004). "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). On the other hand, circumstantial evidence is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997). "Where. . . the claim is based on circumstantial evidence, [the court] employ[s] the burden-shifting framework set forth in *McDonnell Douglas*." *Laster*, 746 F.3d at 726 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802-04).

When using circumstantial evidence to establish a prima facie case of national origin based discrimination "under both Title VII and the Elliot–Larsen Civil Rights Act, Plaintiff must show that 1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class." *Id* at 727. (citations omitted).

Plaintiff's responsive briefing seems to concede that direct evidence of discrimination based on race or national origin does not exist, as he presents an

29

argument only for why he has provided sufficient circumstantial evidence to meet the *McDonnel Douglas* burden-shifting standard. (*See* ECF No. 21, PageID.414.)

Paralleling the arguments made regarding Plaintiff's age-based wrongful discharge claim, Defendant asserts that the fourth "replacement" prong of a prima facie case has not been established, a fact directly disputed by Plaintiff. (ECF No. 17, PageID.103; ECF No. 21, PageID.414.) In support of his view, Plaintiff again notes that he "saw Kiefer mann[ing]. . . Plaintiff's machine on the day [he] was terminated," (*Id.,* PageID.414.) As the court explained above, however, Defendant has successfully presented uncontested evidence that Plaintiff was not "replaced" until two years after his termination. Defendant provided evidence that Plaintiff's tasks, where possible, were distributed among the remaining employees, (*see* ECF No. 17-4, PageID.278), and case law is clear that such a redistribution does not constitute a "replacement," *see Lilley,* 958 F.2d at 752. When asked directly, Plaintiff himself admitted he "ha[d] no idea" who, if anyone, filled his position following his termination and Plaintiff has produced no other evidence directly contesting Cunningham's affidavit. (ECF No. 17-3, PageID.178.) So, for the same reasons elaborated above in Section IV.B.2, the court finds that Plaintiff has failed to present evidence sufficient to establish a prima facie claim of unlawful discharge based on race. Defendant's motion will be granted on Count III (Title VII) and Count IV (ELRCA).

### D. Retaliation Claims

Next, the court considers the claims of alleged retaliation against Plaintiff through his discharge. Plaintiff's complaint contains three counts alleging harassment under Title VII, the ELCRA, and ADEA, respectively.  (ECF No. 1, PageID.15-16.)

> To demonstrate a prima facie case of retaliation under Title VII and the ELCRA, the plaintiff bears the initial burden of establishing that "(1) he ... engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection *489 between the protected activity and the adverse employment action." *Beard v. AAA of Mich.*, 593 F. App'x 447, 451 (6th Cir. 2014) (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)); *see also Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001) (retaliation claims under Section 1981 governed by same standards as Title VII). "[W]hen it comes to federal antidiscrimination laws like § 1981 ... a plaintiff must demonstrate that, but for the defendant's unlawful conduct, [the] alleged injury would not have occurred." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, —— U.S. ——, 140 S. Ct. 1009, 1014, 206 L.Ed.2d 356 (2020)

*Khalaf*, 973 F.3d at 488–89. The same elements are also required for a retaliation claim based on the ADEA. *See Tuttle v. Metro. Govt. of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007). "If and when a plaintiff has established a prima facie case, the burden of production of evidence shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions." *Id.* at 320 (citation omitted).

Defendant does not dispute that Plaintiff filed a complaint with the EEOC in May 2017 (a protected activity), that the company was aware of the filing (knowledge), or that it disciplined and ultimately terminated Plaintiff (an adverse employment action). What remains is whether Plaintiff has pointed to evidence that can present a triable issue of an inference of a causal connection between his EEOC filing and his termination. "This requires proof, even at the prima facie stage, that the unlawful retaliation would not have occurred but for [Plaintiff]'s protected activity." *Wingo v. Michigan Bell Tel. Co.*, 815 F. App'x 43, 46 (6th Cir. 2020) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). Defendant argues that Plaintiff has failed to present evidence of causation and that temporal proximity alone cannot support an

31

inference of causation given the five-month gap between Plaintiff's filing of the EEOC claim and his termination. (ECF No. 22, PageID.715.) The court agrees.

It has been well established that a gap of four-months or more is insufficient to support an inference of retaliation based on temporal proximity. *Cooper v. City of North Olmsted*, 795 F.2d 1265 (6th Cir.1986) (finding no causal connection when there was a four month gap between filing of EEOC complaint and the termination); Consequently, the court finds that the five-month gap between the EEOC filing and Plaintiff's termination, in the present case, means that temporal proximity alone cannot satisfy the causation element.

The court also finds the sole fact that Plaintiff accrued more points for attendance violations under Milton's policy, a few of which he disputes as improper, is not enough to create a triable issue of causation as "the [evidence] in this case contains no evidence directly linking the [additional] citations at issue to [Plaintiff]'s filing of the [EEOC complaint]." *Id.* at 1272. In *Cooper*, the Sixth Circuit found the mere fact that a bus driver was issued six safety citations "in the seven month period preceding her [EEOC] complaint and nine times in the four months following the complaint," leading to her discharge, was insufficient to support "an inference of retaliation." *Id.*

32

The court finds that Plaintiff has failed to provide sufficient evidence that the alleged retaliatory conduct was actually a "but for" cause of Plaintiff's termination. It is undisputed that Defendant's attendance policy states that workers who accrue twelve points, in a rolling one-year period, for unplanned absences, tardiness, or leaving work early will be fired. (*See* ECF No. 17-5, PageID.282-84.) At the time of his termination, Plaintiff had amassed 16.75 attendance points according to Defendant's official calculation. (ECF No. 17-6, PageID.289.) Plaintiff's responsive briefing highlights specific attendance points that Plaintiff argues were improperly assessed. (ECF No. 21, PageID.404-06.) By the court's count, however, the points contested by Plaintiff would only reduce Plaintiff's total at the time of his termination to 12.75 points,[7] meaning that even if the court removes all the points Plaintiff argues have been wrongly added to his total, he would have been suitably terminated in any event under the policy. Since Plaintiff would have been terminated for attendance violations regardless, the disputed attendance points are not a "but for" cause of Plaintiff's termination, and therefore, the court must conclude that Plaintiff has failed to demonstrate a jury question on retaliation. *See Comcast Corp.*, 140 S. Ct. at 1014.

Furthermore, even if Plaintiff were able to establish a prima facie case, Defendants have "provided a sufficient legitimate, non-discriminatory reason" for its

---

[7] Plaintiff's total attendance points according to Defendants:                              16.75pts
            Disputed Points:

| | |
|---|---:|
| May 22 | (1)pts |
| May 25 | (.5)pts |
| 60 days without a violation | (1.5)pts |
| August 28 | (1)pts |

**Total points properly awarded from Plaintiff's perspective:**          **12.75pts**

actions that satisfies the *McDonald Douglas* burden-shifting framework as a matter of law. *See Tuttle*, 474 F.3d at 320. As the court found in Section IV.A, the facts are indisputable that the vast majority of attendance points awarded to Plaintiff, even most of the disputed ones, were based on legitimate violations of the attendance policy. Plaintiff admits he was provided with a copy of the attendance policy and chose not to read it. (ECF No. 17-3, PageID.213; *see also* ECF No. 17-15, PageID.326 (email resending attendance policy on April 28, 2017).) Defendants have also provided evidence that they have regularly terminated other workers who violated the policy. (*See* ECF No. 17-4, PageID.277.) Plaintiff has provided nothing more than mere conjecture that the true motive for the assessment of extra attendance points was retaliation for his May 22nd EEOC claim; therefore, he has failed to meet his burden under the *McDonald Douglas* burdening shifting framework. Since all three retaliation counts rely on the same operative facts for causation, the court concludes that Defendant is entitled to summary judgment on Count IX (Title VII), Count X (ELCRA), and Count XI (ADEA).

### E. ELCRA Stale Law Hostile Work Environment Claim

While the five prongs required to establish a hostile work environment claim under Michigan's Elliot-Larsen Civil Rights Act are essentially the same as Title VII, *see Khalaf*, 973 F.3d at 482, the unique procedural posture of the present action would require the court to conduct a distinct factual analysis while assessing the ELCRA state law claim. Neither party disputes that—unlike the Title VII hostile work environment claim—the Plaintiff's failure to file his claim within 90 days of receiving a right to sue letter from the EEOC does not bar his hostile work environment claim under the

ELRCA. *See Major v. Vill. of Newberry,* 316 Mich. App. 527, 537, 892 N.W.2d 402, 411

(2016) (holding that the three-year statute of limitations in MCL 600.5805 predominates

over filing deadlines in an EEOC "right to sue letter" for the ELCRA). Consequently,

unlike the Title VII analysis above, when analyzing the ELRCA hostile work environment

claim the court would have to consider *all evidence of harassment* from the time of

Plaintiff's hiring in November 2016 to his termination in October 2017. Because the

court has already awarded Defendant summary judgment on all federal claims at issue,

the court declines to exercise supplemental jurisdiction over the single remaining state

law claim (Count II).

Plaintiff's suit is brought under federal question jurisdiction. 28 U.S.C. § 1331.

(ECF No. 1, PageID.2.) The only basis of jurisdiction for Plaintiff's state law claim is

supplemental jurisdiction under 28 U.S.C. § 1367 because both Plaintiff and Defendant

are citizens of Michigan. (*Id.*) A district court may decline to exercise supplemental

jurisdiction when "the district court has dismissed all claims over which it has original

jurisdiction." 28 U.S.C. § 1367(c)(3). "When all federal claims are dismissed before trial,

the balance of considerations usually will point to dismissing the state law claims."

*Musson Theatrical, Inc. v. Federal Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996).

Only, "overwhelming interests in judicial economy may allow a district court to properly

exercise its discretion and decide a pendent state claim even if the federal claim has

been dismissed before trial." *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402,

1412 (6th Cir.1991). The court chose to analyze the other state law claims above

because the state claims relied on nearly identical legal standards and the same factual

allegations as their federal equivalent. Conversely, the state law national origin

35

harassment claim (Count II) covers a much larger time period, and therefore a much larger set of factual allegations compared to the equivalent Title VII claim (Count I) the court has already dismissed. Since the judicial economy interests with regard to this remaining claim are not "overwhelming," the court declines to exercise supplemental jurisdiction and will instead dismiss Count II without prejudice.

## V. CONCLUSION

The court first finds that the evidence presented by Plaintiff is insufficient as a matter of law to demonstrate a prima facie hostile work environment claim under Title VII. Second, Plaintiff is unable to successfully establish that a genuine factual dispute exists regarding an age-based hostile work environment claim based on either the ADEA or Michigan law. Third, Plaintiff cannot show that he was "replaced" within the relevant time period, so his wrongful discharge claims fail. Fourth, undisputed evidence shows that the alleged retaliatory conduct was not the "but for" cause of Plaintiff's termination and the Defendants successfully provided a legitimate, non-discriminatory reason for his termination. Finally, the court finds that since all the Federal claims are resolved, it will decline to exercise jurisdiction over Count II—a Michigan law national-origin-based harassment claim relying on different evidence then the federal Title VII national origin discrimination claim—so the count is dismissed without prejudice. Thus, Defendants are entitled to summary judgment on ten of the eleven counts, and the final remaining state law claim is dismissed without prejudice. Accordingly,

IT IS ORDERED that Defendant's Motion for Summary Judgment (ECF No. 17) is GRANTED as to Count (I), and Counts (III)-(XI).

IT IS FURTHER ORDERED that Plaintiff's State law hostile work environment claim (Count II) is DISMISSED WITHOUT PREJUDICE.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 23, 2021

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 23, 2021, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\AAB\Opinions and Orders\Civil\18-13520.BUI.msj.AAB.RHC.docx